## THE POWHATTAN, etc.

*(Circuit Court, E. D. New York.   July 12, 1882.)*

1. SHIPPING—CATTLE—NEGLIGENCE—BURDEN OF PROOF.
    On a shipment of cattle in an iron ship in hot weather in July, the burden of proof of negligence on the part of the carrier by not providing sufficient ventilation is on the shipper.

2. SAME—NEGLIGENCE OF SHIPPER.
    Where it is not established that there was any negligence anywhere, except such as existed in confining live cattle in the between-decks of an iron vessel in hot weather, and that was the act of the libellant, the libel brought for the loss of cattle by death from heat during the voyage will be dismissed.

3. SAME—CAUSE OF MORTALITY
    The continuance of mortality of cattle after wind-sails are put up and kept up, and the bad condition of the surviving between-deck cattle, was owing to the keeping of the cattle in the between-decks and not to the omission to put up wind-sails at the pier, or to keep the cattle on the pier until the hour of sailing.   See 5 FED. REP. 375.

*Thomas E. Stillman,* for libellant.

*Lorenzo Ullo,* for claimant.

In this case I find the following facts:

The steamer Powhattan is an ocean steamer built of iron. Her length is 267 feet, and her breadth of beam 32½ feet. Her registered tonnage is 998 tons. She was built in 1878, and was owned by the Mediterranean & New York Steam-ship Company, Limited, and was running between New York and European ports. The firm of Phelps Brothers & Co. were the general agents in New York of the Powhattan and of her owners.

The libellant, in 1878, and for many years prior thereto, was a wholesale butcher and dealer in cattle in Brooklyn, New York. The Powhattan was built for the fruit trade, and was so constructed as to render her between-decks well ventilated for that trade. She had permanent ventilators fixed up to ventilate her hold. She had 15 permanent ventilators, 8 of which were meant to let the hot air up, and the rest had cowls on and were meant to catch the air and force it down; some of them being 15 feet high from the deck and others 9. She had four unusually-large hatches. No. 1, the forward hatch, was 11 feet 10 inches long and 8 feet 9 inches broad. No. 2 was 19 feet 6 inches long and 10 feet broad. No. 3 was 16 feet long and 10 feet broad. No. 4 was 8 feet long and 6 feet broad. The combings of all the hatches were 3 feet 10 inches high, so as to enable the hatches to be kept uncovered in ordinary seas.

On the seventeenth of June, 1878, Moses May, the libellant, and the firm of Phelps Brothers & Co., as agents of the steamer Powhattan, entered into a written agreement at New York, of which the following is a copy:

"NEW YORK, June 17, 1878.

"Engaged from Mr. Moses May, per S. S. Powhattan, hence to Bristol, a full load of cattle in the 'tween-decks and on deck. Rate of freight ($32.50) thirty-two dollars fifty cents per head for 'tween-decks, and ($22.50) twenty-

two dollars and fifty cents per head for on deck, payable in gold, without credit or discount, before sailing, with one hundred dollars ($100) gratuity to the master, payable here. It is understood and agreed that not less than (130) one hundred and thirty head of cattle are to be shipped in 'tween-decks, and (102) one hundred and two on deck. Stalls and fixtures, food, etc., for the cattle to be shipped by shippers. Ship to furnish water and room for feed only. Ship not responsible for loss occasioned by stress of weather or any mortality whatever. Ship agrees to supply intermediate passages for two men back from Bristol to New York. Cattle to be shipped within four days from steamer's arrival at this port. Sailing date on no account to be a Monday. Should steamer be detained over five days, to pay demurrage at (£50) fifty pounds, Br. stg., day by day. S. S. Powhattan reported to have sailed from Bristol on the thirteenth of June for Sandy Hook.

"PHELPS BROTHERS & CO.

"Accepted: MOSES MAY."

At the time the agreement was made the Powhattan was on her way to New York, and Mr. Phelps informed Mr. May that she would sail from New York on or before the first of July. Subsequently the agreement was modified so that only 129 cattle were required to be shipped in the between-decks, instead of 130. Subsequently Mr. May received notice from the agents of the Powhattan to ship the cattle on Sunday morning, July 7th, and was then told that the steamer would sail at 9 o'clock on the morning of that day, in order to enable her to leave at slack water, which on that day was at 9 o'clock in the morning. The steamer could not leave her dock except at slack water. On the evening of Saturday, July 6th, the cattle then being in the libellant's cattle-yard, the libellant divided them into two lots. Into one lot he put the 129 largest of the cattle, leaving 102 cattle in the remaining lot. All the cattle were of the same good quality and condition, but those in the 129 lot were the largest and heaviest cattle. Their average weight was 250 pounds more than the arrangement of the cattle in the other lot.

At 3 o'clock on the morning of Sunday the lot of 129 cattle was taken from the yard, and by 9 o'clock they were properly stalled in the between-decks of the Powhattan. The second lot was properly stalled on the deck of the Powhattan before half past 10 o'clock. When the 129 cattle which were put on the between-decks were taken on board the Powhattan they were in good order and condition for shipment, and were so receipted for by the steamer's agent in the bill of lading. There was a delay of about one hour in taking the cattle on board the Powhattan, owing to the planks not being ready for the cattle to go on board. For the reason the steamer had lost the morning slack tide the master of the Powhattan changed the hour of sailing to 3 o'clock in the afternoon, which was the next slack-water time on that day. The morning was, in its early hours, hazy. There was a light breeze blowing then and throughout the day along the river from the south-west. On the pier there was an iron shed running the whole length of the pier, and its crown was about 20 feet above the deck of the steamer. The Powhattan lay on the north side of the pier, which was then the lee side of the shed. At the signal-service station at New York the recorded observations of the thermometer on the seventh of July were, at 7 A. M., 77 deg.; at 12 M., 80 deg.; at 2 P. M., 82 deg.; at 4:35 P. M., 83 deg.; at 9 P. M., 81 deg.; and at 11 P. M., 79 deg. At Hudnut's, on Broadway, in New York, the recorded observations were, at

3 A. M., 72 deg.; at 6 A. M., 70 deg.; at 9 A. M., 77 deg.; at 12 M., 82 deg.; at 3:30 P. M., 88 deg.; at 6 P. M., 82 deg.; at 9 P. M., 75 deg.; and at 12 midnight, 74 deg. Soon after the cattle were stalled in the between-decks the heat in the between-decks became intense, and the sufferings of the cattle from the heat were great. Application was made to the officers of the steamer to put wind-sails in the hatches; but it is not shown that the use of wind-sails at the pier would have afforded material relief to the cattle in the between-decks. The officers of the steamer did not put up any wind-sails at the pier, saying that they would put them up as soon as the steamer left the dock. The libellant then urged the master of the Powhattan to get under way, and the master promised to start at noon. At 3 o'clock the steamer started. Up to that time the heat and closeness in the between-decks were great, and the cattle suffered much therefrom. While the steamer was lying at the pier, 13 of the permanent ventilators were open and in good working order, 8 of which were intended to draw upwards the heat in the between-becks, and thus allow it to escape.

After the steamer left the dock, and while she was passing down the bay, 12 wind-sails were put up and distributed among the four hatches of the Powhattan, and were kept up during the whole voyage and until the arrival of the steamer in Bristol. The hatches were none of them covered during the voyage, and the ventilators were kept open. The heat in the between-decks continued to be great through Sunday, Monday, Tuesday, and Wednesday. During Sunday night two of the cattle in the between-decks died. On Tuesday morning six more of the cattle in the between-decks were found dead, and on Wednesday morning eight more of them were found dead. During Wednesday two more of them died. Those remaining in the between-decks became greatly emaciated, but no more of them died. On the twenty-first day of July the Powhattan arrived at Avonmouth docks, Bristol, England, and there the surviving cattle were delivered to Samuel Pool & Co., cattle salesmen, to whom they had been consigned by Mr. May for sale on commission for his account. There were 111 of the between-decks cattle still living, but they had wasted away and become sickly, and had depreciated in appearance and value. All the cattle shipped on the deck of the steamer were discharged in good condition with the exception of one, which died from natural causes late in the voyage. The Powhattan was not well adapted to the carriage of live cargo below deck in the month of July. Her hatches were large, but her other permanent arrangements for ventilation were not sufficient for the carriage of cattle below deck in the month of July. The cattle were under the care of two foremen and twelve assistants employed by the libellant. An adequate supply of proper food was sent on board by the libellant, and the cattle were properly fed and cared for by those men. The loss of the 18 between-decks cattle and the deterioration of the rest of the between-decks cattle were due to the heat and insufficient ventilation in the between-decks, but it does not appear that by the use of wind-sails, while the ship lay at the pier with the cattle in the between-decks, the between-decks could have been so better ventilated and the heat so moderated that the cattle there would not have sustained injury; nor does it appear that if the vessel had sailed as soon as the cattle were stalled on board, or if the cattle had been

kept on the pier until just before the time when the vessel in fact sailed, the mortality and depreciation in value which happened would not have happened; nor are any means afforded for determining what mortality or depreciation in value is to be attributed to the heat and deficiency of ventilation which existed in the between-decks between the time the cattle were stalled on board and the time the wind-sails were put up; nor does it appear that any negligence on the part of the master or officers of the Powhattan caused the loss or depreciation in value sued for, or that the same did not result inevitably from the placing and keeping of the cattle in the between-decks of the vessel at that season of the year. Neither during the voyage nor on the delivery of the cattle was any notice given to the officers or crew of the Powhattan that they or the vessel were to be held responsible for the mortality and deterioration and depreciation in value of the cattle.

On the delivery of the cattle at Avonmouth docks the consignees gave them proper care, and in due course offered them for sale, but they sold them without any notice to any person connected with the Powhattan. The market value of the sound deck cattle was affected through their being in the same consignment with the between-decks cattle. Mr. Pool sold the 101 deck cattle and 22 of the between-decks cattle in Bristol, but the remaining 89 of the between-decks cattle, owing to their condition, were unsalable there. Such of the cattle as were unsalable in Bristol were taken to Wakefield, and there Mr. Pool succeeded in selling 45 of them. The remaining 44 he was obliged to take to London to find a market. He sold them there. He necessarily incurred additional expenses in selling the cattle at Wakefield and London, but his entire course in the care of the cattle, and in the times, places, and manner of selling them, was prudent and wise. The cattle were all sold and disposed of before any claim was made on the officers or owners of the Powhattan with a view to render them or the vessel responsible for the loss and depreciation in value of the cattle. The services of a veterinary surgeon were employed by Mr. Pool, in England, in respect to the cattle, but his testimony is not produced. A bill of lading, dated July 8, 1878, was given by the ship for the cattle shipped, wherein, among other printed clauses, there was the following:

"Not responsible for the bursting of bags or consequences arising therefrom, or for any of the following perils, whether arising from the negligence, default, or error in judgment of the pilot, master, mariners, engineers, or persons in the service of the ship, or for whose acts the ship-owner is liable, or otherwise, namely, risk of craft or hulk or transhipment, explosion, heat or fire at sea, in craft or hulk, or on shore, boilers, steam, or machinery, or from the consequences of any damage or injury thereto, howsoever such damage or injury may be caused."

At the foot of the bill of lading were these words in writing: "Not accountable for any damage or mortality from any cause." The 18 between-decks cattle which died would have been worth in the market at Bristol, if delivered in good condition, the sum of £536 15s. 6d. ($2,603.35) over and above the expenses of sale. The 45 between-decks cattle sold at Wakefield would have been worth in the market at Bristol, if delivered there in good condition, over and above the expenses of sale, £399 7s. ($1,936.84) more than they were sold

for net. The 44 between-decks cattle sold at London would have been worth in the market at Bristol, if delivered there in good condition, over and above the expenses of sale, £513 6s. 2d. ($2,489.54) more than they were sold for net. The market value of the 101 deck cattle was affected by the condition of the between-decks cattle to the extent of £1 per head, or £123 ($489.85.) The 22 between-decks cattle sold at Bristol would have been worth in the market there, if delivered in good condition, £195 16s. ($949.63) more than they were sold for.

On the foregoing facts I find, as a conclusion of law, that the libel must be dismissed, with costs to the claimant in the district court and in this court.

SAMUEL BLATCHFORD, Circuit Justice.

BLATCHFORD, Justice. On the question as to whether the wind-sails were not put up till Wednesday morning, as contended by the libellant, or were put up on Sunday before reaching Sandy Hook, as contended by the claimants, the district court found in favor of the latter view. As to the omission of the ship to put up wind-sails while she lay at the pier, the district court held that wind-sails would have been of use while the vessel was at the pier; that it was negligence in the ship not to put up wind-sails then; and that the subsequent sickness and death of the cattle in the between-decks were caused by such omission. The argument on the part of the libellant is that the cattle in the between-decks were shipped in good condition, not overheated or exhausted by their transfer from the yards to the ship; that if there were no means of ventilating the between-decks at the pier by wind-sails, the ship should have notified Mr. May that she could not sail till 3 o'clock, so that he might have kept the cattle on the pier; and that the failure to put up the wind-sails was negligence, and all the damages sustained by the libellant can be reasonably attributed to its results. It is further contended for the libellant that such injury was aggravated by the neglect of the ship to put up wind-sails till Wednesday, and that the permanent ventilators of the vessel were insufficient. My conclusions as to these propositions of fact appear in the findings. The burden of proving negligence and of proving that the damage arose from the facts alleged to constitute negligence is on the libellant.

It is not established that there was any negligence anywhere except such as existed in confining live cattle in the between-decks of an iron vessel such as the Powhattan was in hot weather in July. That was the act of the libellant. Negligence in the carrier is not to be presumed from the sickness and death of cattle under such cir-

cumstances. The necessity for putting up wind-sails at the pier must be shown, and that it would have prevented the sickness and death; and that the damage was the direct and proximate result of the omission. This has not been done. The continuance of the mortality through Wednesday, although the wind-sails were put up before reaching Sandy Hook, and kept up, and the bad condition of the surviving between-decks cattle, lead irresistibly to the conclusion that the fatal thing was the keeping the cattle at all in the between-decks of that ship in that weather, and not the omission to put up wind-sails at the pier or to keep the cattle on the pier till the hour of sailing. Certain it is that, with the ship as she was from Sandy Hook on, with wind-sails up and all the appliances she had in use and the hatches open, in view of the causes operating and of the results, no possible discrimination can be made between the damage resulting from the operation of those causes before reaching Sandy Hook and the damage resulting from those causes after reaching Sandy Hook. The evidence is all of it very vague and general. There was not, on the part of any one, any intelligent observation of particular animals as there might have been, so as to show that they sickened or died from the effects of the heat at the pier. All the deaths and all the sickness and all the damage cannot on the evidence be legally attributed to the subjection of the cattle to the heat in the between-decks before reaching Sandy Hook.

The libel must be dismissed, with costs to the claimant in both courts.

See 5 FED. REP. 375.

---

## THE KATE.*

### (District Court, E. D. Pennsylvania. June 27, 1882.)

CARRIAGE OF GOODS BY WATER—DUTY OF CONSIGNEE TO REMOVE GOODS FROM WHARF—WHAT IS REASONABLE NOTICE.

A bill of lading stipulated that the consignee should take the goods from the ship immediately she was ready to discharge. The ship arrived at the dock on Saturday, and on the same day, between 11 and 12 o'clock in the forenoon, notice was sent to the consignee that she would discharge on Monday. The cargo was discharged on Monday, and part of it placed on the pier uncovered, although there was a shed on the pier at the end furthest from the vessel.

*Reported by Frank P. Prichard, Esq., of the Philadelphia bar.